UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **LAGNIAPPE LIGHTING, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. H-11-4538** |
| | § | |
| **BEVOLO GAS & ELECTRIC LIGHTS, INC.,** | § | |
| | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendant Bevolo Gas & Electric Lights, Inc.'s ("Bevolo" or "Defendant") Motion for Partial Summary Judgment ("Motion"). (Doc. No. 34.) After considering the motion, all responses thereto, and the applicable law, the Court finds that Defendant's Motion for Partial Summary Judgment should be **GRANTED**.

**I.    BACKGROUND**

Lagniappe Lighting, LLC[1] ("Lagniappe" or "Plaintiff") owns a retail store that displays and sells lighting fixtures in Spring, Texas. (Doc. No. 1, Compl. ¶ 7.) Plaintiff also owns a number of online stores through which it sells lighting fixtures, including http://www.frenchquarterlanterns.com and http://www.frenchquarterlighting.com (collectively "French Quarter websites"). (*Id.* ¶ 8; Doc. No. 52-4, March 18, 2013 Aff. of Jeff Ber ¶ 11.)

Bevolo is a New Orleans, Louisiana company that produces lighting fixtures. (Doc. No. 32, First Am. Answer and Second Am. Countercl. ("Am. Answer") ¶¶ 24–26.) It has been

---

[1] This suit was brought naming Lagniappe Lighting, Inc. as the plaintiff. (Compl. ¶ 1.) Lagniappe Lighting, Inc. is a non-existent entity. Counselors realized that the plaintiff was improperly named earlier this year. (*See* Doc. No. 42, Motion to Substitute Proper Party as Plaintiff and Counter-Defendant at 1.) The Court permitted Lagniappe Lighting, LLC to be substituted in as the plaintiff in this case. (Doc. No. 60, Order.)

1

producing the lanterns commonly seen throughout the French Quarter of New Orleans since 1945. (*Id.*) Bevolo owns the registered trademark "French Quarter" in International Class 011 for "lighting fixtures." (Doc. No. 34-1, Trademark Electronic Search System ("TESS") Registration Printout.)[2]

Sometime in 2004, Plaintiff became an authorized distributor of Bevolo lighting products. (Compl. ¶¶ 13–14; Am. Answer ¶ 27.) Plaintiff sold Bevolo lighting fixtures, as well as other lighting fixtures, through its online store http://www.frenchquarterlanterns.com. (Compl. ¶¶ 12–13; Am. Answer ¶ 28.) Lagniappe began using the http://www.frenchquarterlanterns.com domain in 2004, though parties dispute whether Lagniappe began using that domain only after it became an authorized distributor of Bevolo products. (*Compare* Compl. ¶¶ 12–13 *with* Am. Answer ¶ 28.)[3]

On September 29, 2011, Bevolo terminated the distributorship relationship. (Doc. No. 34-2, Termination Letter.)[4] Bevolo sent a letter to Lagniappe indicating that the termination was "effective immediately," and that Lagniappe was "no longer authorized to act as a distributor of Bevolo products in any manner." (*Id.* at 1.) As part of this termination, Bevolo demanded that Lagniappe immediately:

1. [C]ease and desist from any further dispensing, providing, marketing, sale, lease, or other distribution[] of any Bevolo goods or services;

2. [R]emove any and all Bevolo marks including, without limitation, the word "Bevolo" (collectively "Bevolo Marks") from any and all visible locations in and around all of [Lagniappe's] places of business;

---

[2] Bevolo first filed for registration of its "French Quarter" mark on November 10, 2008, and the mark was registered on July 7, 2009. (TESS Registration Printout.)

[3] Lagniappe contends that it began selling Bevolo lighting products only after the registration and first use of the http://www.frenchquarterlanterns.com website. (Compl. ¶ 12.) Bevolo indicates that Lagniappe only began using the http://www.frenchquarterlanterns.com domain contemporaneously with becoming an authorized distributor for Bevolo. (Am. Answer ¶ 28.) Parties offer no evidence to support either position.

[4] Bevolo contends it terminated the relationship because it learned that Lagniappe was selling cheaper competitor products to Bevolo's customers. (Mot. at 3–4.) However, no evidence is offered to support this assertion.

3.  [C]ease and desist from using any of the Bevolo Marks in any way in connection with any web sites that [Lagniappe] own[s] and/or administer[s] . . . ; and

4.  [R]emove all photographs, drawings, or other images depicting any Bevolo goods or services from all brochures, web sites and/or other promotional materials of any kind or character, and delete all electronically stored photographs, drawings or other images from all computers, hard drives and/or temporary storage devices.

(*Id.* at 1–2.)  If Lagniappe adhered to these terms, Bevolo would "honor outstanding quotes for thirty (30) days from the date of this letter." (*Id.* at 2.)  Furthermore, the letter stated that if Lagniappe executed and returned the termination letter in the space provided within five days of receipt, and complied with the letter's requirements, Bevolo would forego legal action; otherwise, Bevolo reserved the right to seek appropriate legal remedies. (*Id.*)

Jeff Ber, owner of Lagniappe, signed the termination letter on October 4, 2011. (*Id.*; March 18, 2013 Ber Aff. ¶ 3.)  In addition to signing the letter, however, Ber added a note to the letter.  He placed a star next to provision number four above, and added a handwritten sentence toward the end of the termination letter. (Termination Letter at 2; Doc. No. 56-1, April 3, 2013 Aff. of Jeff Ber ¶ 9.)  The handwritten note, which began with a star, stated as follows: "We are working on revising our website to remove all references to Bevolo and hope to have this completed by 10-16-2011 or sooner if possible." (Termination Letter at 2.)

Before Ber signed the termination letter, he also communicated with Mark Johnson, Chief Financial Officer of Bevolo. (Doc. No. 52-2, October 3, 2011 Email from Johnson to Ber; Doc. No. 34-3, Johnson Decl. ¶ 2.)  Johnson laid out "guidelines to Bevolo no longer doing business with Lagniappe." (October 3, 2011 Email from Johnson to Ber.)  These guidelines discussed only existing orders, how long Bevolo would honor prior quotes, payment protocols, and return of excess inventory. (*See id.*)

3

In November of 2011, Ber received an email from Bevolo's attorney, demanding that Lagniappe cease using all Bevolo trademarks, including its www.frenchquarterlanterns.com domain. (Doc. No. 52-3, November 1, 2011 email from Ted M. Anthony to Ber.) Lagniappe subsequently sued, seeking a declaration of non-infringement, and an order invalidating Bevolo's trademark in the term "French Quarter" in connection with lighting fixtures. (Compl. ¶¶ 20–21.) In response, Bevolo countersued, bringing a number of counterclaims, including breach of contract. (Am. Answer ¶¶ 36–59.) Bevolo now moves for partial summary judgment as to liability only on its breach of contract claim against Lagniappe. (*See generally* Mot.)

## II.     LEGAL STANDARD

To grant summary judgment, a court must find that the pleadings and evidence show that no genuine issue of material fact exists, and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.* If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.* "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted) (internal quotation marks omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007). Courts may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Hearsay, conclusory allegations,

4

unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996) *see also Liquid Air Corp.*, 37 F.3d at 1075 (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Liquid Air Corp.*, 37 F.3d at 1076 (citation omitted) (internal quotation marks omitted). A court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Id.* at 1075.

### III.  ANALYSIS

To prevail on a breach of contract claim under Texas law, a plaintiff must show: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009); *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Bevolo argues that each element above is met, and it moves for summary judgment as to liability only on its breach of contract claim. (Mot. at 6–8.) It argues that the signed termination letter was a valid contract between Bevolo and Lagniappe, whereby Lagniappe agreed to cease using all Bevolo trademarks in exchange for Bevolo forgoing legal action. (*Id.* at 7.) It contends that Lagniappe breached this contract by continuing, to this day, to operate the French Quarter websites, which use Bevolo's French Quarter trademark. (*Id.*)

Lagniappe disputes the existence of a valid contract, arguing there was no meeting of the minds that Lagniappe was required to stop using its French Quarter websites. (Doc. No. 52, Resp. at 6–7.) It argues that, because neither the termination letter nor the October 3, 2011 email ever specifically stated that Lagniappe was to stop using its French Quarter websites, there was no meeting of the minds as to this point. (*Id.* at 6–7.) Alternatively, Lagniappe argues that, at the very least, the termination letter's silence on the meaning of the term "Bevolo marks" renders the contract ambiguous, and a fact issue exists as to whether Lagniappe's continued use of the French Quarter websites constitutes a breach of the contract. (*Id.* at 13–14.) Lagniappe also argues, in the alternative, that by failing to mention that Lagniappe was to stop using its French Quarter websites, Bevolo fraudulently induced Ber to forfeit Lagniappe's rights in the French Quarter websites, and, accordingly, Lagniappe is not bound by the contract. (*Id.* at 8–11.) Finally, Lagniappe argues that it is entitled to equitable relief on the grounds of a unilateral mistake. (*Id.* at 11–13.)[5] The Court will address each argument in turn.

A.  **Meeting of the Minds**

For a contract to be valid, "the minds of the parties must . . . meet with respect to the agreement's subject matter and essential terms." *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 75 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 556 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *see also Domingo v. Mitchell*, 257 S.W.3d 34, 40 (Tex. App.—Amarillo 2008, pet. denied) ("A

---

[5] Lagniappe does not argue that Bevolo has failed to perform under the contract. Although Bevolo has not offered any record evidence to support its factual assertion that it has performed under the contract (*see* Mot. at 7), as it should have done under Federal Rule of Civil Procedure 56(c)(1), the Court considers the fact undisputed, because Lagniappe does not challenge it. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."). Lagniappe similarly does not contest Bevolo's assertion, unsupported by record evidence, that it has suffered some amount of damages as a result of Lagniappe's continued operation of the French Quarter websites. (*See* Mot. at 8.) The Court accepts as an undisputed fact that Bevolo has suffered some damages as a result of Lagniappe's continued operation of the French Quarter websites.

'meeting of the minds' is a mutual understanding and assent to the expression of the parties' agreement."). Whether there was a meeting of the minds "is based on the objective standard of what the parties said and did and not on their subjective state of mind." *DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)); *Wal–Mart*, 93 S.W.3d at 556. "The meaning reasonably conveyed by the parties' actions and words, rather than their uncommunicated subjective intentions, controls whether a contract has been formed." *Oliver v. Kroger*, 872 F. Supp. 1545, 1550 (N.D. Tex. 1994) (citing *Fuqua v. Fuqua*, 750 S.W.2d 238, 245 (Tex. App.—Dallas 1988, writ denied)); *see also Harrison v. Williams Dental Grp., P.C.*, 140 S.W.3d 912, 916 (Tex. App.—Dallas 2004, no pet.).

Lagniappe argues the termination letter does not constitute a valid contract because the parties did not have a meeting of the minds as to the meaning of the term "Bevolo marks." (Resp. at 6.) Specifically, it contends that, although the parties agreed that Lagniappe would cease using all "Bevolo marks," they never agreed as to what that term meant, and there was no mutual understanding that the term "Bevolo marks" required Lagniappe to cease using its French Quarter website. (*Id.* at 7.) Lagniappe claims it understood the contract to require Lagniappe to remove all references to "Bevolo" only. (*See* March 18, 2013 Ber Aff. ¶¶ 4–9.)

There is no objective indication by either party that the term "Bevolo marks" was limited only to the word "Bevolo." Ber's addition of language stating that Lagniappe was "revising [its] website to remove all references to Bevolo" by a certain date (*see* Termination Letter at 2) is not objective evidence that Lagniappe believed the term "Bevolo marks" referred only to the word "Bevolo." First, the additional language appears to refer specifically to provision four, requiring

7

Lagniappe to remove all depictions of "Bevolo goods or services."[6] The term "Bevolo marks" is not even contained in provision four, and the Court is hard-pressed to see how a clarification regarding that provision can constitute objective evidence of the meaning of a term not contained therein. Second, even if this note is assumed to be a general addition to the contract, not specific to provision four, the additional language simply indicated the date by which Lagniappe hoped to complete one requirement of the contract: removing all references to Bevolo from its website. Setting a date to accomplish one requirement of the contract does not constitute objective evidence that Lagniappe thought no other requirement existed.

Lagniappe also points to an email between Ber and Johnson, sent after Bevolo made its offer but before Lagniappe accepted, as further evidence of Lagniappe's understanding of what the termination letter required. (Resp. at 7.) Lagniappe's characterization of Johnson's email as somehow informative of Lagniappe's obligations under the contract is unfounded. Johnson's email provides no objective evidence of what meaning the parties ascribed to the term "Bevolo marks." Indeed, the email is plainly not about the meaning of any terms in the offer Bevolo sent. The email string is titled "Bevolo – outstanding invoices," and it discusses Bevolo's willingness to continue honoring certain orders and quotes, its prioritization of outstanding orders, and its expectation that Lagniappe would pay all invoices by the end of the month. (October 3, 2011 Email from Johnson to Ber.) Johnson's email was actually a reply to an inquiry from Ber about how Lagniappe should handle the Bevolo lighting fixtures Lagniappe still had on display. (Doc. No. 52-2 October 3, 2011 Email from Ber to Johnson.) In response to the inquiry, Johnson provided a full explanation of how remaining inventory and outstanding orders would be

---

[6] The note's relationship to provision four can be inferred from the placement of the handwritten star next to provision four and at the beginning of the handwritten note. (Termination letter at 2.)

handled. (October 3, 2011 Email from Johnson to Ber.) It is entirely silent as to *any* of the obligations Lagniappe acquired under the terms of Bevolo's termination letter.

The parties' words and actions cut against Lagniappe's argument. *See Fuqua*, 750 S.W.2d at 245. The language of the termination letter clearly states that the term "Bevolo marks" is broader than merely the word "Bevolo." (Termination Letter at 2 (requiring removal of all Bevolo marks *including, without limitation, the word Bevolo*) (emphasis added)). Although Ber added a note to the contract (*see* Termination Letter at 2), he never wrote in Lagniappe's understanding of the term "Bevolo marks." Instead, Ber signed the termination letter, indicating that he accepted that Lagniappe had to remove all "Bevolo marks," not only the word "Bevolo." Lagniappe's proffered understanding of the term "Bevolo marks" reflects nothing more than Ber's subjective and uncommunicated state of mind, which cannot prevent the formation of a contract. *See Fuqua*, 750 S.W.2d at 245; *Oliver*, 872 F. Supp. at 1550. Furthermore, as explained *infra* Part III.B, the term "Bevolo marks," in its context, unambiguously refers to Bevolo's trademarks. Ber's subjective belief that Lagniappe was required only to "stop using the 'Bevolo' name" and to comply with details regarding payment set out in Johson's email (*see* March 18, 2013 Ber Aff. ¶¶ 4–9) cannot invalidate Lagniappe's acceptance of the actual, unambiguous terms offered in the termination letter. *See Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623, 646–47 (S.D. Tex. 2009) (holding that disputed contractual terms were not ambiguous, and further holding that defendant's subjective understanding of what plaintiff meant by those terms did not "create a fact issue as to whether there was a meeting of the minds").

"The following elements are required for the formation of a valid and binding contract: 1) an offer, 2) acceptance in strict compliance with the terms of the offer, 3) a meeting of the minds,

9

4) each party's consent to the terms, and 5) execution and delivery of the contract with the intent that it be mutual and binding." *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied). Lagniappe's argument that there was no meeting of the minds must be rejected. The termination letter clearly satisfies the requirements of a valid contract.

**B.     Ambiguity**

In interpreting a contract, a court's primary concern is to give effect to the true intent of the contracting parties. *Sw. Bell Tel. Co. v. Fitch*, 801 F. Supp. 2d 555, 566 (S.D. Tex. 2011) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)); *Burns v. Exxon Corp.*, 158 F.3d 336, 340 (5th Cir. 1998) (citation omitted). To achieve this objective, courts "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citations omitted).

The terms in a contract are to be given their "generally accepted or commonly understood meaning" unless otherwise defined in the contract. *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007) (citing *W. Reserve Life Ins. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (Tex. 1953)); *Valence*, 164 S.W.3d at 662. Dictionaries may provide assistance to courts in determining the ordinary meaning of a contractual term. *Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 833 (Tex. App.—Dallas 2003, pet. denied); *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). "Under Texas law '[i]f the written instrument is so worded that it can be given a certain or definite meaning or interpretation, then it is not ambiguous . . . .'" *Square D Co. v. House of Power Elec., L.C.*, No. H–09–3917, 2011 WL 6091805, at *3 (S.D. Tex. Dec. 7, 2011) (quoting *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)); *Nat'l Union Fire Ins. Co. of*

*Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citation omitted). Interpretation of an unambiguous contract is a legal issue that is properly decided on summary judgment. *Boudreaux v. Unionmutual Stock Life Ins. Co., of Am.*, 835 F.2d 121, 123 (5th Cir. 1988).

"If, however, the language of a . . . contract is subject to two or more reasonable interpretations, it is ambiguous." *Nat'l Union*, 907 S.W.2d at 520 (citations omitted). "An ambiguity does not arise simply because the parties offer opposing interpretations." *Building Specialties, Inc. v. Liberty Mut. Fire Ins. Co.*, 712 F. Supp. 2d 628, 635 (S.D. Tex. 2010) (citing *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006)). "An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning." *DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999) (citing *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1980)). "Further, for an ambiguity to exist, both potential meanings must be reasonable." *Id.* (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). "[A]mbiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *Nat'l Union*, 907 S.W.2d at 521). "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Coker*, 650 S.W.2d at 394; *see also JRG Capital Investors I, LLC v. Doppelt*, No. H–11–3299, 2012 WL 2529256, at *3 (S.D. Tex. June 28, 2012). "Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation." *Nat'l Union*, 907 S.W.2d at 520 (citing *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981)). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a

whole in light of the circumstances present when the contract was entered." *Id.* at 520 (citing *Coker*, 650 S.W.2d at 394; *R & P Enterps.*, 596 S.W.2d at 518).

Here, Lagniappe contends that the contract is ambiguous because the parties never defined the term "Bevolo marks" and the contract does not explicitly state that Lagniappe must cease using the term "French Quarter." However, the failure to define the term "Bevolo marks" does not render the term ambiguous, because, among the ordinary meanings of the word "mark," are "trademark" and "service mark." *See Black's Law Dictionary* 1055 (9th ed. 2009); *see also Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/mark (last visited July 18, 2013). Indeed, in the context of the contract, "trademark" and "service mark" are the *only* meanings of the term "mark" that make sense. Lagniappe does not offer an alternate reasonable interpretation of the term "Bevolo marks." Ber states that he knew he was expected to stop using the term Bevolo (*see* March 18, 2013 Ber Aff. ¶ 9), perhaps suggesting that the term "Bevolo marks" may be interpreted as referring only to the word "Bevolo." However, this interpretation is not reasonable, as it would require the Court to disregard the portion of the contract specifically stating that "Bevolo marks" are not limited to the word "Bevolo." (*See* Termination Letter at 2.) *Albemarle Corp. v. MEMC Elec. Materials, Inc.*, 685 F. Supp. 2d 652, 659–660 (S.D. Tex. 2010) ("[C]ourts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract . . . .") (citations omitted). Accordingly, the Court finds the termination letter unambiguously required Lagniappe to cease using all Bevolo trademarks and service marks, including the French Quarter mark Lagniappe uses in its French Quarter websites.

Ber's additional note stating that Lagniappe was "revising [its] website to remove all references to Bevolo" by a certain date (*see* Termination Letter at 2) also does not render the

contract ambiguous. Lagniappe appears to argue that Ber's indication that Lagniappe was updating its website created ambiguity about whether the contract required Lagniappe to cease using its French Quarter websites. (Doc. No. 56, Sur-reply at 5.) However, the mere mention of a timeline for making certain changes to its website does not render ambiguous the fact that the contract also required Lagniappe to cease using certain domain addresses for its website.

Lagniappe's argument that the contract's silence as to the fact that Lagniappe would be required to cease using its French Quarters websites rendered the contract ambiguous is also without merit. The contract clearly requires Lagniappe to cease using Bevolo's trademarks and service marks. A publically accessible database allowed Lagniappe easily to determine what trademarks and service marks Bevolo owned, thereby eliminating any possible confusion as to what, precisely, was encompassed by the term "Bevolo marks."[7] Lagniappe has offered no authority for the proposition that Bevolo was obliged to specify which trademarks and service marks it owned. In fact, the rule is quite the opposite; Lagniappe, by signing the contract, was tasked with understanding its obligations under the contract. *See Amouri v. Sw. Toyota, Inc.*, 20 S.W.3d 165, 169 (Tex. App.—Texarkana 2000, pet. denied) ("The general rule is that every person who has the capacity to enter into a contract is held to know what words were used in the contract, to know their meaning, and to understand their legal effect."[8]); *see also R. Conrad Moore & Assoc., Inc. v. Lerma*, 946 S.W.2d 90, 94 (Tex. App.—El Paso 1997, writ denied) ("[A]bsent a finding of fraud, failure to apprehend the rights and obligations under the contract will not excuse performance."); *In re Cajun Elec. Power Coop.*, 791 F.2d 353, 359 (5th Cir. 1986) ("A person who signs a written instrument is presumed to know its contents and cannot

---

[7] The United States Patent and Trademark Office operates the Trademark Electronic Search System, which enables searching by owner, and provides a list of all trademarks and service marks an party owns. The database is accessible at http://tess2.uspto.gov.

[8] One exception to this general rule is if a party is fraudulently induced to enter into a contract. *Amouri*, 20 S.W.3d at 170. Lagniappe raises this defense, and the Court addresses it *infra* Part III.C.

13

avoid its obligations by contending that he did not read it, or that it was not explained or that he did not understand it."). Lagniappe's failure to inquire or research what marks Bevolo owned does not create any ambiguity in the meaning of the term "Bevolo marks."

The Court concludes that, under the unambiguous contract terms, Lagniappe was required to cease using its French Quarter websites. Ber admits that Lagniappe continues to use the French Quarter websites, and that they comprise "a significant portion of Lagniappe's business operations." (March 18, 2013 Ber Aff. ¶ 11.) Accordingly, the Court concludes that Lagniappe has breached the contract.

### C. Fraudulent Inducement

"A party fraudulently induced to consent to a contract is not bound by the contract's terms and may rescind the entire contract." *Suzlon*, 662 F. Supp. 2d at 647 (citations omitted); *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998); *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 322 (Tex. App.—Houston [14th Dist.] 2011, no pet.). The elements of fraudulent inducement are the same as those for common-law fraud. *Suzlon*, 662 F. Supp. 2d at 647 (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990)). "The elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of the truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Id.* at 648 (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998)).

"Fraud can be by either misrepresentation or passive silence." *Id.* (citing *Santanna Natural Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 890 (Tex. App.—Austin 1997, pet. denied)). "As a general rule, a failure to disclose information is not fraudulent unless there

14

is a duty to disclose the information." *Id.* (citing *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001)). "Several [Texas] courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression." *Bradford*, 48 S.W.3d at 755; *Suzlon*, 662 F. Supp. 2d at 648. "There is generally no duty to disclose a fact that the other party knew or should have known." *Suzlon*, 662 F. Supp. 2d at 650 (citing *Terry v. Mercedes-Benz*, No. 05-06-00118-cv, 2007 WL 2045231, at *3 (Tex. App.—Dallas 2007, no pet.). Whether a duty to disclose exists is a question of law. *Bradford*, 48 S.W.3d at 755.

Lagniappe argues that Bevolo fraudulently induced it to enter into the contract by failing to specify, in both the termination letter and in subsequent emails between Ber and Johnson, that, by agreeing to the terms of the termination letter, Lagniappe would be forfeiting its rights to use the French Quarter websites. (Resp. at 8–11.) However, Bevolo had no duty to explain the effect of the contract on Lagniappe's French Quarter websites. As explained *supra* Part III.B, Lagniappe easily could have ascertained what marks Bevolo owned. Lagniappe had every opportunity to ascertain what exactly it was agreeing to, either by checking an online database, or by simply asking what marks Bevolo owned. *Terry*, 2007 WL 2045231, at *3 (recognizing no duty to disclose information contracting party should have known); *cf. Bradford v. Vento*, 48 S.W.3d at 756 (recognizing that a party to a contract may reasonably assume that the party it contracts with is aware of information it could easily obtain through reasonable inquiry).

This is not a case of partial disclosure. The case Lagniappe relies on, *Citizens National Bank v. Allen Rae Investments*, 142 S.W.3d 459, 476–77 (Tex. App.—Fort Worth 2004, no pet.), is easily distinguishable. There, a borrower invested in a project that a bank officer recommended as a "good deal." *Citizens Nat'l Bank*, 142 S.W.3d at 468–69. However, the

15

officer had failed to disclose his concerns with the project, and the bank's determination that it would not recommend such an investment to other clients. *Id.* at 477, 478. The Court held that the officer's failure to disclose this information while the borrower was in the process of closing the deal was sufficient to support a finding of fraud. *Id.* at 479. Here, Bevolo did not posses any information that Lagniappe could not easily access that affected the terms of the contract. Unlike the borrower in *Citizens National Bank*, who had no independent means of learning of the bank's conclusion that the investment opportunity previously recommended was a poor one, Lagniappe had only to check a public database in order to learn all of the information Bevolo knew.

### D. Unilateral Mistake

Under Texas law, a unilateral mistake is generally insufficient to warrant setting aside a contract unless the mistake is induced by acts of the other party. *Seymour v. Am. Engine & Grinding Co.*, 956 S.W.2d 49, 58 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *Torchia v. Aetna Cas. and Sur. Co.*, 804 S.W.2d 219, 224–25 (Tex. App.—El Paso 1991, writ denied); *see also Kendziorski v. Saunders*, 191 S.W.3d 395, 407 (Tex. App.—Austin 2006, no pet.) ("In general, a unilateral mistake by one party to an agreement is not a ground for relief when the mistake was not known to the other party or induced by the other party."). Courts have indicated that equitable relief based on a unilateral mistake may be granted when "(1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; [and] (4) the parties can be placed in status quo in the equity sense; i.e., rescission must not result in prejudice to the other party except for the loss of his bargain." *Welkener v. Welkener*, 71 S.W.3d 364, 366 (Tex. App.—

Corpus Christi 2001, no pet.); *see also Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 232 (5th Cir. 1985); *N. Natural Gas v. Chisos Joint Venture I*, 142 S.W.3d 447, 456 (Tex. App.—El Paso 2004, no pet.).

Lagniappe argues that it meets each of these criteria. (Resp. at 11–12.) As explained *supra* Part III.C, Lagniappe was not induced to enter this contract. Accordingly, the Court starts from the presumption that a unilateral mistake will not invalidate a contract Lagniappe entered into freely. *See, e.g.*, *Seymour*, 956 S.W.2d at 58. Furthermore, Lagniappe has not exercised ordinary care. Lagniappe easily could have ascertained the marks Bevolo owned, but instead, it chose simply to assume, contrary to the very wording of the contract, that it had only to remove references to the word "Bevolo." (March 18, 2013 Ber Aff. ¶ 9.) It did so based on one email communication with Johnson, that, on its face, was not about the termination letter, but rather about other matters concerning the end of Lagniappe's and Bevolo's relationship. (Resp. at 12; Sur-reply at 5 –6; *see also* October 3, 2011 Email from Johnson to Ber.) The mere existence of one communication between the contracting parties that bears, at best, a tangential relationship to the contract does not present a genuine issue of material fact as to whether Lagniappe's mistaken understanding of the scope of the term "Bevolo marks" was made despite exercising ordinary care. "In Texas, parties to a contract are chargeable with such knowledge that the exercise of ordinary diligence would have revealed and a contract will not be set aside because of a mistake if that mistake is a result of carelessness, indifference, or inattention." *Interfirst Bank*, 778 F.2d at 232–33; *S. Nat'l Bank of Houston v. Crateo, Inc.*, 458 F.2d 688 (5th Cir. 1972); *cf. Kendriorski*, 191 S.W.3d at 407 ("A person who signs a contract is presumed to know the contents of the contract.").

Because Lagniappe has raised no genuine issue of material fact as to any of the elements of a breach of contract claim, or as to any of its affirmative defenses, the Court finds that summary judgment as to liability on Bevolo's breach of contract claim must be granted.

## IV. CONCLUSION

For the reasons set forth in this order, Defendant's Motion for Partial Summary Judgment (Doc. No. 34) is **GRANTED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 22nd day of July, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE